UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| BRIAN WATERMAN, | § | |
| *Petitioner* | § | |
| | § | |
| V. | § | CAUSE NO._____ |
| | § | |
| McKINNEY INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | TRIAL BY JURY DEMANDED |
| *Respondent* | § | |

## ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Plaintiff , Brian Waterman ("Waterman" or "Plaintiff") filing this his Original Complaint, complaining of McKinney Independent School District ("Defendant" or MKISD"), ; and by way hereof, Plaintiff would show the following:

### I.   PARTIES

A.   Plaintiff is a resident of this District and Division.

B.   Defendant is a public school district with its principal place of business in McKinney, Collin County, Texas., and may be served with process herein BY SERVING ITS Superintendent at his place of business, One Duvall Street | McKinney, Texas 75069 |.

### II.   JURISDICTION

This court has jurisdiction pursuant to Title 28 USCA, §§ 1331, and 1343.

III.    ENABLING STATUTE

A.    This suit is brought pursuant to Title 42 USCA, § 1983.

B.    Waterman brings this suit to address and remedy violations of his Constitutional rights, privileges and immunities, as secured to him by the United States Constitution, First, Ninth, and Fourteenth Amendments.

IV.    FACTS

A.    Waterman, a single father, medically "retired' fireman, and trained teacher was employed by Defendant to teach incarcerated students in the MKISD's Collin County Juvenile Center, County Residential Center ("CRC").

B.    Waterman was employed with McKinney Independent School District ("District") from July 2007 through September 13, 2011.

C.    For the 2010-2011 school year, Waterman was supervised by Principal Cynthia Morton.

D.    Before the events made the basis of the attack by MKISD on Waterman's public service employment, in 2011, Waterman reported the following to Morton:

   1.    social-grading-without-testing of CRC's GED students;

2. the student enrollment at the CRC was being improperly inflated to increase MKISD's state funding by including ineligible students on the CRC's roster or student roll;

3. the CRC faculty members were being deprived of their designated lunch periods;

4. the apparent mishandling of the Teacher of the Year award in 2010-2011, to nominate and elect a favored faculty member in violation of the rules.

E. After Waterman reported the observed violations, an event involving a fellow teacher, Natasha Knapton ("Knapton") on February 18, 2011, was manipulated by MKISD, through Morton and aides, with the support and approval of the MKISD central administration, into creating a false basis for publicly proposing to terminate Waterman's employment for "sexually harassing an employee".

F. On February 18, 2011, Knapton had entered into a verbal exchange with incarcerated male students in the presence of the monitoring Deputy Sheriff (Todd), and fellow instructor Waterman, when one of the male students, in his dialogue with Knapton, used a sexually charged double entendre term.

H. On February 22, 2011, Knapton spoke with a co-worker about the incident, and the co-worker informed Morton and advised Knapton to inform Morton.

I.  Knapton spoke with Morton and later told a Waterman that it was clear to her that Morton and her counselor Strickland were interested in getting Waterman.

J.  Morton then spoke with Deputy Meeks, the Sheriff's administrator of the CRC facility, and discussed the events of February 18, 2011, and the two of them decided to protect Todd who had been instrumental in generating the conversation, and shift the blame to Waterman.

K.  Morton planned to have Waterman "hang himself", so to speak so she decided to obtain from him a written statement which could be used against him.

L.  Late of the evening of February 24, 2011, Morton texted Waterman and stated that she wanted to meet with him on the morning of February 24, 2011.

M.  Waterman notified Morton that he was to be absent on February 25, 2011.

N.  On March 1, 2011 Waterman met with Morton.

O.  In that meeting, Morton "..requested [Waterman] to write a statement of what [he had] said in the D-pod at the CRC on February 18, 2011…[and as an inducement for his disclosure] told [Waterman] that "…what occurred was a learning curve for us all, that we would move forward and that there would be no disciplinary action taken…[and]…that the purpose of the request for the statement

was for record keeping only." Morton told Waterman to return to work, and there was no issue because of the February 18, 2011 events in Pod D.

P.  Waterman, relying on Morton's representations, did as she asked and wrote the statement, reciting in his statement that it was being written for Morton "under the conditions" of Morton's representations (¶ J. *supra*).

Q.  Waterman spoke with Knapton on March 1, 2011 and told her of the meeting with Morton; Knapton replied that she had not made an issue of the situation with the student but that counselor Strickland had approached her and caused her to speak to Morton. Knapton went on to say that when she spoke with Strickland and Morton it was clear that there was an attempt by them to blame Waterman for something and it made her sick.

R.  On the morning of March 2, 2011, Waterman turned in his written statement to Morton.

S.  On the afternoon of March 2, 2011, about the end of class time, counselor Strickland came to Waterman's office and informed him that Morton wanted to see him.

T.  Waterman went to Morton's office and noticed that Morton was in Meeks' office; Morton asked Waterman to join Meeks and her, then shut Meeks' office door.

U.     Morton told Waterman that Knapton complained that Waterman had presented a "Hostile Work Environment", followed up by the statement, "… Let me give you an example, Mrs. Knapton stated that you have been asking her where she lives." Waterman responded that the day before, on March 1, 2011, Mrs. Knapton, Dan Sines, Mike Z and he had taken lunch together at Jason's Deli, and while he had initially asked Knapton where she lived, he clarified and asked if her husband Steve had to make the daily drive from McKinney to Greenville where he worked. Waterman described the conversation that he had had with Knapton in the presence of the other teachers during the lunch.

V.     Morton then said, "Let me get to the point and tell you that Mrs. Knapton felt uncomfortable and I will have to do an investigation for Dr. Davis. I know you guys are friends, however I would not text her or call her until the investigation is over."

W.     Meeks interjected, "You know you can be arrested"…, to which Waterman replied, "For what?".

X.     Meeks replied "If Mrs. Knapton had called the police they could arrest you because you violated Ms. Morton's directive by talking to her yesterday."

Y.	Waterman turned to Morton and stated, "You never gave me a directive. All you told me was that there would be no discipline action and that this was a learning curve for all of us and that we would go forward."

Z.	Morton admitted, "It's true that I did not use the word 'directive', but I thought it was implied that I didn't want you [Waterman] to communicate with Knapton."

AA.	Morton said she would find a place for Waterman at the MLC, "something for you to do while the investigation is taking place and it should not take very long for the matter to be investigated and go to Dr. Davis. You want to wait until later this evening to get your things or do you prefer to get them now?"

BB.	On or about April 6, 2011, Waterman filed a grievance against Davis and Morton.

CC.	On April 6, 2011, MKISD's "Chief Human Resources Officer" James A. Davis ("Davis") wrote Waterman notifying him of Davis' receipt of the grievance and that the Level One would be heard by him on April 11, 2011, however the notice was withheld from Waterman to deny his participation in and access to the grievance process.

DD.  At no time did Morton repudiate or deny to Waterman that she had made the inducing representations on March 1, 2011, *until* she was invited to do so by MKISD's attorney on September 13, 2011during Waterman's termination hearing.

EE.  On March 2, 2011, Knapton met with Waterman. Morton, and was induced to start writing a statement which might be used against Waterman. Morton would edit and correct Knapton's statements as turned in by Knapton.

FF.  The allegations against Waterman were false and intentionally constructed by Morton, on the claims of Knapton, Vasquez, and Reiter, employees of the MISD.

GG.  Morton was obligated by MKISD practice and policy to conduct a fair, accurate, and complete investigation.

HH.  Instead, Morton knowingly conducted an inaccurate and incomplete and unfair or result-driven and skewed and baseless investigation as a basis for termination of Waterman.

II.  On Wednesday, March 2, 2011, Waterman was administratively pulled out on some testing, and eventually Ms. Knapton and Mr. Waterman ran into each other.

JJ.  Plaintiff Waterman had still not been informed of the seriousness or job threatening nature of Ms. Knapton's communications with Morton.

KK.  Later, Waterman and Knapton were each separately invited by co-workers to a group lunch at Jason's Deli, not invited by the same person and not aware that the other party was attending.

LL.  Waterman arrived at the restaurant before Ms. Knapton, who acknowledged that she saw Waterman from her car and decided to go inside, knowing that Waterman was there to have lunch with the same group as she.

MM.  The lunch went pleasantly, and Knapton later testified that although she could have avoided he lunch, she didn't want to do so.

NN.  Knapton didn.t have any money at Jason's and had only a checkbook, causing Waterman to offer to pay for her lunch.

OO.  During the lunch conversation, Waterman did not ask where she lived, but did ask what route her husband "takes to work", as light conversation related to Knapton's husband's business where Waterman traded, and his daily long drive on a dangerous road from McKinney to their home in Greenville.

PP.  Still not catching on as to how Knapton was being used by Morton, on that same day Waterman went by Knapton's office and delivering her different items

for her to take to her children, or that he thought she would find interesting; according to Waterman, this was not an unusual event.

QQ. On Thursday, Knapton met privately with Morton and Meek to discuss Waterman.

RR. By this meeting, Morton and Meek had convinced Knapton that she was at risk because of Waterman.

SS. Knapton inquired about the hug Waterman had told her that Morton had given him on March 1, 2011, and Morton told Knapton that Waterman had lied to her about everything, except for the hug.

TT. Morton later told the MKISD Board of Education that she didn't hug Waterman.

UU. Waterman was assigned to DAEP on March 8, 2011.

VV. Early on March 25, 2011, Waterman was told by Morton to go to Davis' office, where he was interrogated by Davis, and placed on administrative leave for the "allegation that [he] had sexually harassed an employee."

WW. On March 31, 2011, Waterman reported to Commissioner Scott, TEA that MKISD was illegally inflating its student roles and that he had been retaliated against because he had reported that and other matters to Morton, his "campus

administrator". In his letter, Waterman protested that the retaliation had taken the form of 'false accusations, to precipitate [his] separation from employment and make it appear that [he was] a disgruntled employee."

XX. On that same day, Waterman also made an open records request, which was challenged by the MKISD to the Attorney General.

YY. On the evening of September 13, 2011, a nonrenewal hearing on Waterman's contract was held at the McKinney Independent School District Administration Building. The Board's counsel and the person in charge of the hearing was local lawyer Roger Sanders ("Mr. Sanders").

ZZ. Waterman did not receive a fundamentally fair hearing although that was is constitutional right.

AAA. Because of a serious injury in late July 2011, Waterman's attorney ("Watts") could not travel to attend the hearing and was forced to participate by phone with the assistance of a non-participating assistant who had traveled to McKinney and was visually monitoring the proceedings in the MKISD Board room.

BBB. Sanders and the MKISD deprived Waterman of a meaningful and fair hearing.

CCC. Nevertheless, MKISD produced a result oriented hearing and terminated Waterman.

DDD. Waterman spoke out within the context of First Amended protected speech when :

1. he spoke on matters which were not purely job related, such as :
    a. giving grades to untested students;
    b. Illegal inflation of student roles to fraudulently obtain state funding;
    c. Denial of state mandated lunch periods;
    d. Denying a democratic process within the school situation which was created by policy and practice;
    e. Abridging Waterman's academic freedom in his use of an admitted learning exercise; and
    f. Denial of false and retaliatory charges in a hearing on the matter of his termination.
2. he spoke on matters of concern to the community when he spoke on items a. through f.
3. his speech was not substantially disruptive of the educational process; and

EEE. Waterman's suspension, subjection to a fundamentally unfair and harassing investigatory process was substantially motivated by his exercise of protected speech.

FFF. Waterman was entitled to a due process hearing by the policies and practices of the MKISD before being recommended for termination, and he was denied both fair notice and a meaningful hearing.

GGG. But for the denial of a fundamentally fair hearing, Waterman would not have been terminated.

HHH. Plaintiff prays for:

1. A trial before a jury on the factual elements of his claims as stated in Paragraphs DDD through GGG;

2. Upon the verdict of a jury trial, Waterman prays for a judgment declaring that the defendant violated his Constitutional rights;

3. Upon the verdict of a jury trial, Waterman prays for a judgment awarding damages; and

4. An award by the court awarding to him reasonable and necessary attorney's fees and costs, as well as any other relief to which he may be entitled in law or in equity.

<SIGNATURE BLOCK ON FOLLOWING PAGE>

Respectfully submitted,

WATTS & ASSOCIATES,

/S/LW
Larry Watts
Texas Bar No. 20981000
P.O. Box 2214
Missouri City, Texas 77459
Telephone: (281) 431-1500
Facsimile: (877) 797-4055
E-mail: wattstrial@gmail.com

*Attorney for Plaintiff*